GEORGE S. CARDONA
Acting United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
JEREMY D. MATZ (Cal. Bar # 199401)
Assistant United States Attorney
Major Frauds Section
MICHAEL R. WILNER (Cal. Bar # 156592)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
1100 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-0649/0687
Facsimile: (213) 894-6269
E-mail: jeremy.matz@usdoj.gov
michael.wilner@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LILA RIZK,<br><br>Defendant. | No. CR 07-755-DDP<br><br>**GOVERNMENT'S POSITION WITH RESPECT TO PRESENTENCE REPORT AND SENTENCING FACTORS REGARDING DEFENDANT LILA RIZK**<br><br>Hearing: January 29, 2010, at 10:00 a.m. |

*

*

*

*

*

*

*

*

*

## TABLE OF CONTENTS

PAGE

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . 1

II. FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A. Overview of the Fraud Scheme . . . . . . . . . . . . . 3

B. Rizk's Role In The Fraud Scheme . . . . . . . . . . . . 4

1. Rizk's Inflated Appraisals . . . . . . . . . . . . 5

2. The Inflated Appraisals Were Material . . . . . . 7

3. Proof of Rizk's Fraudulent Intent . . . . . . . . 7

III. THE PRESENTENCE REPORT'S CALCULATION OF ADVISORY GUIDELINES . . . . . . . . . . . . . . . . . . . . . 9

IV. THE GOVERNMENT'S ANALYSIS OF THE RELEVANT SENTENCING FACTORS LISTED IN 18 U.S.C. § 3553(a) AND RESPONSE TO PROBATION OFFICER'S RECOMMENDATION . . . . . . 11

A. The 3553 Factors Weigh In Favor of a Guidelines Sentence . . . . . . . . . . . . . . . . . . 11

B. Response to the Probation Officer's Below-Guidelines Recommendation . . . . . . . . . . . 15

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . 17

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Defendant Lila Rizk awaits sentencing for her convictions following a jury trial in this mortgage fraud case. The jury convicted Rizk of criminal conspiracy, bank fraud, and numerous loan fraud counts. The Probation Office determined that Rizk's advisory guideline range is 97 to 121 months in custody.

The government concurs with that calculation, and respectfully recommends a low-end sentence of 97 months. Rizk abused her position and breached her duties as a licensed real estate appraiser in the course of this criminal scheme. Rizk's inflated appraisals enabled the masterminds of the fraud scheme -- co-conspirators Mark Abrams and Elliott Fitzgerald -- to steal over $40 million from federally insured lenders. While Rizk did not profit from the crimes to the same degree as Abrams and Fitzgerald, her role in the scheme was essential to its illegal success. The jury agreed, and convicted Rizk for willfully generating numerous corrupt appraisals.

At sentencing, it is appropriate for this Court to take into account Rizk's role in the entire mortgage fraud scheme. Rizk's phony appraisals were used in dozens of transactions throughout California on behalf of her co-schemers. Whether the appraisals were submitted in her name or in the name of innocent licensed appraisers, Rizk deliberately and eagerly assisted the other criminals in manipulating the lenders. Rizk should properly be sentenced based on her long-term participation with the organizers of the fraud.

This Court is well aware of the significance and scope of the criminal scheme at issue. The Court previously imposed a stiff sentence of 168 months in custody on co-conspirator Fitzgerald. There are obvious differences between the roles that Fitzgerald and Rizk played in the scheme, and enormous differences in the illegal compensation that each participant derived. Even so, federal law requires that potential disparities in sentencing be taken into consideration in evaluating a reasonable custody term. A sentence for Rizk of roughly half of Fitzgerald's sentence will avoid any such disparity, especially given Rizk's refusal to accept responsibility for her actions.

Additionally, a hefty sentence will send a clear message of deterrence to the mortgage industry. Legitimate licensed appraisers work in a relatively small professional community. A lengthy prison sentence against this appraiser for assisting in a multi-million dollar fraud scheme will undoubtedly reverberate within that group. A stern sentence from this Court may realistically prevent others from committing major financial crimes like Rizk in the future.

Finally, there is nothing about Rizk's background or involvement in this crime that outweighs the aggravating facts to such a degree that a below-guidelines sentence is warranted. Despite the overwhelming evidence of her criminal participation in the deals, Rizk steadfastly refused to admit her involvement here. The other charged fraudulent appraiser (Scott Robinson) and lower-level employees in the fraud scheme all acknowledged

their roles at various times in this case. Rizk still has not. Instead, she remains recalcitrant in the face of abundant proof of her extraordinary criminal conduct. Following the lengthy jury trial, Rizk's disrespect for the rule of law and her refusal to accept responsibility weigh heavily against her. The government respectfully requests that the Court sentence Rizk to 97 months in custody for her key role in implementing this fraud scheme.

## II. FACTS

The government concurs with the statement of defendant's offenses in the presentence report. For the Court's convenience, the government offers a brief summary of the criminal conduct here.[1]

### A. Overview Of the Fraud Scheme

The scheme itself involved fraudulent mortgage loans that grossly exceeded the actual value of the properties that supposedly secured the loans. Between 2000 and 2003, a group controlled by co-conspirators Abrams and Fitzgerald obtained inflated mortgages on over 90 properties throughout California. The fraud scheme led to actual losses to lenders of over $40 million. See PSR at ¶ 25.

---

[1] Because of the Court's detailed familiarity with this case -- from the previous imposition of criminal sentences, the acceptance of guilty pleas from other co-schemers, the related civil lawsuit brought by the defrauded lenders, the lengthy criminal trial during the summer of 2009, and the evidentiary submissions of the parties regarding post-trial motions -- the government has not resubmitted voluminous evidence with the Court as part of this sentencing submission.

To implement the scheme, Desert Pacific Financial[2] generally bought lower-priced homes located in affluent neighborhoods and sought mortgages at far above the homes' true values. In a typical transaction, DPF bought a home on the open market at approximately $1 million, falsely represented it to a lender as having a value of $2.5 million to $3 million, and obtained a mortgage of $1.5 million (or 60-65% of the phony value of the property). DPF submitted fraudulent purchase contracts, loan applications, appraisals, and title records to convince the lenders of the legitimacy of the transactions. DPF also used the names and identities of "straw buyers" to obtain the properties and mortgage loans. See PSR at ¶¶ 15-17.

In the transactions that closed during the course of the scheme, the organization generally made a profit of over $500,000 per deal. That sum represented the difference between the amount of the inflated loan and the true purchase price of the property. The illegal profits were then split by Abrams and Fitzgerald, their employees, and the outside professionals who assisted DPF in implementing the wide-ranging fraud scheme. See PSR at ¶ 23.

**B. Rizk's Role In The Fraud Scheme**

Rizk was a licensed appraiser. Records obtained from the California Office of Real Estate Appraisers showed that she became an appraiser in 1992. Rizk upgraded the classification of

---

[2] Abrams and Fitzgerald operated through several business entities and partnerships. For the Court's convenience, their organization will be identified as "Desert Pacific Financial" ("DPF") (one of their primary business names) in this memorandum.

her license several times to ultimately obtain a certified residential appraiser's license. According to an official with the state agency who testified at trial, that is the highest level of residential appraisal licence that the agency issues. This authorized Rizk to appraise homes without review by a supervisory appraiser or a second, co-signer on her inflated appraisals as described below. See PSR at ¶¶ 10, 68, 73.

**1. Rizk's Inflated Appraisals**

During the scheme, Rizk prepared and signed written appraisal reports for properties that DPF used to acquire mortgage loans. Rizk provided a written valuation of each property that was purportedly backed up by her analysis of the subject home and other comparable properties that she stated were of equivalent market value. See PSR at ¶¶ 15, 18.

Rizk wrote her reports using standard forms designated by federal agencies for use in mortgage transactions. Rizk acknowledged on the face of her written reports that she knew her analysis would be submitted to a mortgage lender. Specifically, Rizk stated that the reports were "intended for use by the lender / client for a mortgage transaction only." Additionally, Rizk expressly stated that her valuation of the properties was on an "as is" basis of the then-current market value of the homes. In doing so, Rizk disavowed appraising the properties at some speculative value based on future construction or improvements to the homes. See PSR at ¶ 18.

Rizk appraised each subject home as being worth the inflated value that DPF fraudulently told the lenders on the bogus loan

applications. In doing so, Rizk deliberately omitted from her written reports information that was readily available to her regarding the true -- and far lower -- value of the properties. Rizk deceptively concealed from the lender that each property was publicly listed on the Multiple Listing Service ("MLS") at a price far lower than the appraised value. Instead, Rizk reported to the lender that the subject home "is currently in escrow with no transfer within the last 12 months." That statement falsely implied that Rizk had searched the MLS database for the property and found no conflicting price information. In reality, the MLS contained information showing the listing of the home at a far lower price than Rizk's inflated appraisal. The government established at trial -- through Rizk's own admissions to a lender -- that she possessed access to the MLS and regularly appraised properties in the Los Angeles area. See PSR at ¶¶ 18-22.

Also, Rizk's appraisal reports compared the subject homes to other homes that Rizk claimed were "comparable" to the house in the transaction. These comparable homes purported to support the inflated value of the homes. In reality, Rizk's allegedly comparable homes were larger, had more valuable features, and were located in nicer residential neighborhoods, which accounted for their higher values. See PSR at ¶ 18. The government presented expert testimony at trial to establish that (a) the "comps" in Rizk's reports were objectively improper for an appraiser to use to support the valuation of the subject property, and (b) information about actual comparable homes that reflected the true value of the subject property was easily

available through public data sources regularly used by appraisers. This information showed that Rizk willfully appraised the subject homes at prices far above market value as part of the scheme.

**2. The Inflated Appraisals Were Material**

The jury heard of the unquestionable significance of Rizk's inflated appraisals. A representative of Aurora Loan Services, the underwriter of the fraudulent loans that DPF obtained, testified at trial about the materiality of independent appraisal reports in the loan process. According to Aurora, appraisal reports assessing the value of the subject property were fundamental documents that were required as part of the loan package. See PSR at ¶ 16. Without Rizk's appraisal reports falsely justifying the value of the subject homes, DPF would not have been able to execute the fraud scheme at the expense of Aurora, Lehman Brothers Bank, and RBC Mortgage Company.

**3. Proof of Rizk's Fraudulent Intent**

Additionally, the government presented evidence demonstrating Rizk's criminal intent in participating in the fraudulent loans. The evidence demonstrated that Rizk delegated to an unlicensed co-conspirator the job of viewing, photographing, and analyzing many of the "comps" listed in her appraisal reports. This was in stark violation of a sworn statement in her appraisal reports that she had personally observed all of the houses listed in her reports.

Rizk also prepared a second, false report in many transactions to be submitted to lenders in the name of

co-defendant Scott Robinson.[3] The phony appraisals in her name and those that she ghost-wrote for Robinson fraudulently supported the bogus loan applications that DPF submitted to lenders. See PSR at ¶¶ 21-22. In return, Rizk demanded and received money from DPF far above the typical fees that legitimate appraisers charge. The payments included hundreds of thousands of dollars in monthly retainer fees and personal mortgage payments. See PSR at ¶ 26.

Notably, the evidence showed that Rizk provided non-stop bogus appraisals for DPF from 2000 through the end of the scheme in 2003. Rizk continued to receive her excessive salary even during the phase of the scheme when DPF submitted her phony appraisal reports for properties located hundreds of miles from Rizk's Southern California home. Evidence at trial established that Rizk traveled by private jet to Northern California to appraise houses for DPF even though her name typically did not appear on the final reports submitted to lenders. See PSR at ¶ 22. By the end of the scheme, Lehman Brothers Bank and other lenders incurred over $40 million in losses. See PSR at ¶ 25.

---

[3] Rizk brought Robinson into the DPF fraud scheme. Robinson was indicted with Rizk, and pled guilty well before trial in this case. Robinson also awaits sentencing from this Court for his involvement here. However, Rizk is responsible for inducing Robinson to participate in the mortgage fraud; she truly put Robinson in harm's way here. See PSR at ¶¶ 14, 20-22.

**III. THE PRESENTENCE REPORT'S CALCULATION OF ADVISORY GUIDELINES**

The presentence report concludes that Rizk's offense level is 30. That calculation is based on: (a) a base offense level of 6 for Rizk's fraud convictions, (b) a 22-level enhancement for a loss in excess of $20 million, and (c) a 2-level enhancement for abuse of a special skill. See PSR at ¶¶ 34-39. With a criminal history category of I based on no previous criminal convictions, the presentence report concludes that Rizk's advisory sentencing guideline range is 97 to 121 months. See PSR at 4.

The government agrees with the presentence report's analysis of the guidelines. The evidence presented to the Court during trial is far more than sufficient to establish the guideline enhancements in the presentence report, including the fraud loss attributable to the mortgage scheme. When an enhancement has an "extremely disproportionate effect" on a sentence the district court may be required to apply a clear and convincing evidence standard. United States v. Munoz, 233 F.3d 1117, 1127 (9th Cir. 2000); but see United States v. Berger, 587 F.3d 1038, 1048-49 (9th Cir. 2009) (affirming use of the preponderance standard for calculating loss in a fraud case, and collecting cases using the preponderance standard to calculate loss amount when the loss was part of a scheme to defraud for which the defendant was convicted).

Here, the clear and convincing proof at trial established Rizk's culpability from the loss for the mortgage fraud, from inception through the end of the scheme in 2003. The government proved that Rizk was on the DPF payroll for years, and that she

provided bogus appraisal reports throughout that period. For each bogus appraisal, Rizk indicated that she (a) had researched the actual sales history of the property, and (b) knew that her inflated appraisal was being submitted in a mortgage transaction. See PSR at ¶ 18.a-f.

In addition to the reports in her name and those that she wrote for co-defendant Robinson to sign, there were additional reports submitted to lenders in the names of appraisers unaffiliated with the scheme. See PSR at ¶ 22. The Court heard testimony at trial that Rizk wrote those reports for DPF after traveling to Northern California locations with DPF personnel. Additionally, testimony from a case agent established that Rizk retained in her own files an appraisal report in her name that DPF ultimately submitted to a lender in the name of another appraiser. The two appraisals were identical. (RT 7/16/09 vol. IV: 25-32 (IRS SA Robert Sterling)). Further, trial testimony from co-conspirator Jamieson Matykowski demonstrated that Rizk knew -- indeed, she was relieved when she learned -- that her co-conspirators substituted the names of other appraisers for hers on certain reports. All of this evidence conclusively proves that the fraud loss attributable to the entire conspiracy was reasonably foreseeable based on Rizk's central role in the scheme.

Additionally, the government thoroughly proved that Rizk abused her special, professional skill as an appraiser. The Court heard direct testimony at trial from a state regulator about the licensing requirements that govern real estate

appraisers in California. Rizk was an experienced, licensed appraiser who wrote legitimate-looking reports for lenders. In doing so, she was required to register with the lenders and include her state license number on the face of each bogus report she submitted. This misconduct fully justifies the enhancement for abuse of a special skill.

The government concurs in the Probation Officer's decision not to reduce Rizk's offense level for any purported acceptance of responsibility (the report notes that Rizk refused to discuss the offenses when interviewed for the presentence report). See PSR at ¶ 29.

## IV. THE GOVERNMENT'S ANALYSIS OF THE RELEVANT SENTENCING FACTORS LISTED IN 18 U.S.C. § 3553(a) AND RESPONSE TO PROBATION OFFICER'S RECOMMENDATION

The government respectfully requests that the Court sentence Rizk to a low-end guideline term of 97 months in custody. There is no identified basis for the Court to vary from the advisory guidelines, and a within-guidelines sentence will lead to a fair and appropriate result here. The government's proposed sentence reasonably reflects the sentencing factors contained in 18 U.S.C. § 3553(a), including an analysis of defendant's offense, her personal background, her lack of respect for the law, the need for deterrence and punishment, and the role of the advisory guidelines.

**A. The 3553 Factors Weigh In Favor of a Guidelines Sentence**

The nature and circumstances of this case justify a significant prison sentence for Rizk.[4] She was an integral player in this multi-year fraud scheme. The co-schemers repeatedly submitted fraudulent, multi-million dollar loan applications to federally insured lenders. The centerpiece of those bogus applications were grotesquely inflated appraisals that Rizk personally prepared.

Rizk unwaveringly provided those reports and participated in the joint venture from 2000 through the collapse of the scheme in 2003. At the core of her misconduct was her willingness to inflate the perceived value of the property that was supposed to provide security to the lender making a loan in the transaction. Rizk's appraisal reports misled the lenders in a way no different from DPF's phony loan applications. Indeed, by appearing to be honest, professional reports from an independent party with no stake in the outcome, Rizk's reports took on an outsized importance in the lending decisions here. But for Rizk's triple-inflated reports, these fraudulent loans would not have been issued at all. Rizk's misconduct played a central -- and indispensible -- role in the circumstances of the charged crimes.

The history and characteristics of the offender[5] weigh heavily against Rizk at sentencing too. Rizk was a licensed and certified appraiser with considerable experience in the industry.

---

[4] 18 U.S.C. § 3553(a)(1).

[5] 18 U.S.C. § 3553(a)(1).

By the time she joined forces with DPF to implement the fraud scheme, Rizk had the background, educational qualifications, professional training, and work record sufficient to allow her to understand the wrongful nature of her actions. Even so, Rizk prepared phony report after phony report for years. This was no aberration or one-time flawed decision. To the contrary, Rizk chose to link up with the Abrams-Fitzgerald organization, and was well paid for her illegal choice.

A guideline sentence will foster the statutory goals of reflecting the seriousness of the offense, promoting respect for the law, punishing this offender, and affording deterrence to criminal conduct.[6] As noted in the introduction to this memorandum, the field of real estate appraisals is tightly regulated and involves a fairly small professional community. The numerous appraisers who testified at Rizk's criminal trial (including the government's respected expert appraiser) were all disturbed at the outrageously inflated valuations she ascribed to the properties involved here. A significant sentence here will let other appraisers know that the federal courts will deal severely with such extreme misconduct. That result may have as much of a positive impact on real estate practices in Southern California as any other remedial, regulatory, or policy change implemented following the end of the recent real estate bubble.

Rizk's disrespect for the rule of law is notable here. For each of her phony appraisal reports, Rizk used a standard

---

[6] 18 U.S.C. § 3553(a)(2)(A-B).

industry form required for most appraisals pursuant to federal housing regulations. She signed, and attested to the accuracy of, her reports below a lengthy statement regarding her alleged adherence to professional guidelines. Indeed, each of her reports contained an additional statement that Rizk's appraisal was "conforming to U[niform] S[tandards of] P[rofessional] A[ppraisal] P[ractice]," which was a declaration that she abided by the laws governing her profession. All of these statements were false, of course, as Rizk blithely violated fundamental precepts of appraisal practice on dozens of occasions. Rizk's lack of respect for the law was inherent in the very conduct that brings her before this Court at sentencing. Her refusal to accept responsibility for her crimes and her willingness to rope another appraiser (Robinson) into the scheme are also reflective of her lack of respect for the law.

Another significant factor for this Court to consider here is the need to avoid unwarranted sentence disparities among offenders who participated in similar conduct.[7] The prosecutors are not aware of another case in this district in which a licensed real estate appraiser facilitated a $40+ million mortgage fraud. However, in sentencing co-defendant Fitzgerald in late 2008, the Court imposed a prison term of 168 months on one of the ringleaders of the organization.[8] There are many

---

[7] 18 U.S.C. § 3553(a)(6).

[8] It is counsel's recollection that the Court stated that it considered imposing an even higher sentence, but declined to (continued...)

facts about Fitzgerald's case that are unique to him and should not have any impact on Rizk: Fitzgerald's flamboyant spending; his destruction of important evidence; his overseas flight to avoid prosecution; and his refusal to return to the United States voluntarily.

Even so, Fitzgerald's offense depended on finding a willing and complicit partner who would assist DPF in preparing real-looking appraisals to unlock the cash at the banks. Rizk became a partner of Fitzgerald and Abrams in this crime for years. While she did not earn the same financial rewards from her criminal conduct as the others, Rizk unabashedly planted herself in DPF's camp in participating in these crimes. As a result of her repeated choices to help these criminals and violate the law, Rizk's punishment should fairly be gauged by the firm sentence that this Court imposed on her colleague. Given her denial of responsibility, a final sentence of 97 months -- as compared to the 168 month sentence that Fitzgerald is now serving following his guilty plea -- is a just and understandable result.[9]

---

[8](...continued)
do so after considering the government's low-end recommendation for Fitzgerald.

[9] The remaining 3553(a) factors do not appear to apply here. Rizk has lost her appraisal license, so there is no need for the sentence here to serve to protect the public from further crimes from the defendant. [18 U.S.C. § 3553(a)(2)(C)]. Further, the presentence report does not note that defendant has any substance abuse, drug addiction problems, mental, emotional, or psychological problems that need to be considered at sentencing. [18 U.S.C. § 3553(a)(2)(D)]. Finally, the (continued...)

**B. Response to the Probation Officer's Below-Guidelines Recommendation**

The Probation Officer recommends a below-guidelines sentence of 60 months here. The basis for that recommendation is the Probation Officer's conclusion that Rizk has demonstrated respect for the law based on her post-indictment cooperation with pretrial release and the presentence report process. See Recommendation Letter at 4. That analysis puts to the side the many years during which Rizk thoroughly disregarded the law by repeatedly assisting her co-schemers here. Further, although the Probation Officer correctly notes that Rizk received less personal profit than others in the organization, see id., her six-figure gains make her much more than a minor player in the fraud plot.

More significantly, the Probation Officer contends that, based on Rizk's role in the scheme, "the amount of loss in this matter was beyond her control." See id. The government believes that this conclusion is not consistent with the considerable evidence presented at trial about the lending and appraisal process. As a licensed appraiser, Rizk knew -- indeed, it was her job to honestly state -- the actual value of the homes. When Rizk generated her inflated appraisals at triple the homes' true value -- in reports that she acknowledged were to be used in

---

[9](...continued) government does not believe that any kind of non-custodial or probationary sentence is appropriate given the nature, circumstances, and seriousness of the crimes here. [18 U.S.C. § 3553(a)(3-4)].

mortgage transactions -- it was entirely foreseeable that loans of 60-65% of the inflated valuation were to be funded.[10]

Rizk was therefore well aware that the loans and potential losses would be hundreds of thousands of dollars higher than the actual values of the homes. Rizk certainly had the ability to control the potential losses here had she cut ties with Fitzgerald and Abrams and refused to generate the inflated appraisals. Instead, she willingly churned out the fraudulent reports with predictable financial consequences. The government respectfully believes that the factors identified in the Probation Officer's letter do not support a 35%+ reduction from the advisory guidelines.

---

[10] During this period, many lenders were prepared to finance loans of 80% or higher of a home's appraised value.

**V. <u>CONCLUSION</u>**

This Court has a deep command of the egregious facts of this case. Defendant Rizk played a key role in one of the most damaging mortgage fraud plots in the nation. She now faces a lengthy prison term for her crimes. There is nothing unique or sympathetic about Rizk's situation, though, that should take her case out of the minerun of federal fraud cases.

For the foregoing reasons, the government respectfully requests that the Court impose a low-end guidelines sentence of 97 months in custody on Rizk, along with the other sentencing recommendations and terms, including restitution, as recommended by the Probation Office.

Dated: January 22, 2010

Respectfully submitted,

GEORGE S. CARDONA
Acting United States Attorney

CHRISTINE C. EWELL
Assistant U.S. Attorney
Chief, Criminal Division

/s/ AUSA Wilner

JEREMY D. MATZ
MICHAEL R. WILNER
Assistant United States Attorneys
Major Frauds Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA